[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter is before the court for a final custody determination. The real parties in interest are the plaintiff father, Lawrence Dickson, and the defendant mother, Consuella Jones. Though never married, they are the natural parents of Jazmyn Dickson, a seven year old female. At a hearing held on September 19, 2000, the case was withdrawn as against Erica Reynolds who it was mistakenly believed had been appointed the child's guardian. Also a named defendant is Ms. Eartha Dunbar, the maternal CT Page 11835 grandmother, who was given temporary custody by Brennan, J. on December 16, 1999. The father, mother, and maternal grandmother testified at the hearing as did Ms. Karen Kutno, the Family Relations Counselor who did a custody and visitation evaluation and rendered a report. Although the father earlier believed the maternal grandmother wanted custody, Ms. Dunbar made clear at the hearing she did not — both because she felt the parents were capable of caring for her and because she presently provides a home for the children of another daughter. Each parent here seeks custody of Jazmyn, each believing he/she can better provide for the child's needs.
Mr. Dickson is now married to Aundretta Dickson and they reside in the Bridgeport home of Mrs. Dickson's mother. The household also includes Mr. Dickson's mother-in-law, this couple's infant daughter Lauren and Mrs. Dickson's four year old daughter, issue of a prior relationship. The home has three (3) bedrooms and one and one-half (1 1/2) bathrooms. When Jazmyn visits her father, she shares a bedroom with Lauren. Mr. Dickson works as a Driver Sales Representative for Conway five (5) days per week from 11:00 a.m. to 7:30 p.m. He drives a tractor trailer and delivers freight to towns in the Naugatuck Valley. Aundretta Dickson is a medical assistant who has Wednesday off but otherwise works from 9:00 a.m. to 5:00 p.m. (or 6:00 p.m. occasionally). If the plaintiff is awarded custody, Aundretta will care for Jazmyn on Wednesday and, on the other week days during the school year, Jazmyn will either participate in an after-school program until Aundretta Dickson picks her up after work or she will be cared for by the same babysitter who now cares for the couple's infant daughter. On snow days or during school vacations, the plaintiff and his wife will alternate taking time off from work or Jazmyn may stay with their infant's babysitter. During summer vacations, Jazmyn will participate in day programs or the plaintiff's mother-in-law, who works from 11:00 p.m. to 7:00 a.m., will care for her:
Ms. Jones now resides in Virginia with an adult daughter (of another relationship), that daughter's seven year old son, and, as of recent date, Jazmyn. Relevant here is that Ms. Jones has been convicted of multiple drug offenses (to include sale of narcotics) and has served time in prison. She has also been convicted of violation of probation. Presently, she is on probation until September of 2001. The testimony was that, although she did well during the first year of her probation (beginning September of 1998), she began to receive warning letters from the probation department and ultimately was moved to a higher level of supervision; it is believed this occurred after her mother, defendant Dunbar, reported her daughter to again be using drugs in October of 1999. Contrary to that testimony, Ms. Jones stated she had not used drugs "since a couple of years ago." Also relevant is that the mother, while still on probation, has removed with Jazmyn to the State of Virginia CT Page 11836 without informing anybody in that state's department of probation though she has been there for weeks. She testified her probation officer here, Marilyn Vangele, knew of and approved her move and that she weekly telephone reports to Ms. Vangele; she offered no corroborating testimony, however. Ms. Jones had been employed by Wal-Mart here for approximately one and one-half (1 1/2) years when her adult daughter was offered an employment opportunity in Virginia and, since Ms. Jones had been sharing with that daughter the caretaking responsibility of the daughter's seven year old, the daughter invited Ms. Jones to join her in Virginia, an offer Ms. Jones accepted once she learned Wal-Mart would transfer her. She continues to care for her grandson and lives in a townhouse she and the daughter own. Her work hours are from 10:00 p.m. to 6:30 a.m. She stated Jazmyn was usually in bed before she left for work each evening and that she readied the child for school each morning when she returned from work. Ms. Jones' daughter stays with Jazmyn and her own son overnight. The Virginia townhouse has one (1) bedroom but there are sleeping accommodations for all four (4) occupants since there is a pullout sofa and Ms. Jones works evenings while her adult daughter works days.
The defendant Dunbar has not yet visited the Virginia residence but she indicated she would visit regularly if Ms. Jones were awarded custody. Ms. Dunbar is a loving, hard-working, devoted grandparent to whom both Ms. Jones and her sister (the incarcerated mother of the children Ms. Dunbar raises) are immeasurably indebted. She has offered her grandchildren a nurturing environment, the opportunity for the children to remain in an intact family, and this court is satisfied Ms. Dunbar has made best efforts to discipline them and provide the kind of stable home life of which they would otherwise have been deprived. Though Ms. Dunbar had been given temporary custody of Jazmyn pending a final determination of custody (Brennan, J. on December 16, 1999), Jazmyn had, by January 11, 2000, accrued nineteen (19) unexcused tardies and seven (7) unexcused absences at Wilbur L. Cross School.[1] Since Ms. Jones' last confinement ended in September of 1998, it was clearly her responsibility to get her daughter up and ready for school each morning. Despite Ms. Dunbar's reporting of her daughter's drug use in October of 1999, Ms. Dunbar testified she believed her daughter should be given custody because she felt her daughter had changed. Ms. Dunbar did not, however, deny Mr. Dickson was a good parent. Describing both parents as "good people", she felt Ms. Jones should be given the opportunity to raise Jazmyn because she believed her daughter had been a good caretaker for her two older daughters. The evidence did not establish when precisely Ms. Jones' drug use had begun.
Having completed a custody and visitation study, it was Ms. Kutno's recommendation the parents have joint legal custody and that Jazmyn live CT Page 11837 with Mr. Dickson. Because Ms. Jones was living in Bridgeport when the study was conducted, her recommendation was that the child spend alternate weekends with the mother and that Ms. Jones immediately undergo a hair follicle drug test which, if positive for drug use, would result in the mother having supervised visitation only. Having learned the mother was now living in Virginia, her recommendation the father be given residential custody was reinforced. Ms. Kutno had observed Jazmyn with both parents and, though she concluded the child loved both parents, her opinion was that Jazmyn's behavior with her father was more age appropriate whereas, in the presence of her mother, Jazmyn assumed the role of an adult/friend. Ms. Kutno recounted Ms. Jones' detailed recitation — in the child's presence — of what she perceived to be Mr. Dickson's ill treatment of her over the course of their tortured relationship[2] and she related that Jazmyn responded to the same by calling out her mother's name loudly several times and circling her forefinger around her ear. Jazmyn told Ms. Kutno she did that to let her mother know she was acting "cuckoo." Ms. Kutno's further opinion[3]
was that it would be detrimental to Jazmyn to permanently reside in Virginia because it would disrupt the secure, loving and stable relationship she had with her father. She further testified that, if Ms. Jones had remained in Connecticut and were awarded residential custody, the situation — though "not preferred" — would be "tolerable" since Jazmyn would continue the benefit of an ongoing relationship with both her father and maternal grandparent.[4]
The court has heard the testimony, observed the witnesses, evaluated their credibility, examined the exhibits, and considered Connecticut General Statute § 46b-56. The court shares Ms. Kutno's concerns regarding Ms. Jones' parenting skills and finds those concerns were underscored by the mother's own testimony. While Ms. Jones indicated she believed Mr. Dickson's reason for spending as much time as he did with Jazmyn was because Mr. Dickson wanted to resume a sexual relationship with Ms. Jones — a belief apparently shared by Ms. Dunbar, Ms. Dunbar offered no evidence she had in fact ever witnessed any sexual overture by the plaintiff or that she had ever overheard Mr. Dickson express such an interest to her daughter, a fact Mr. Dickson denied. The father appears happily remarried and his wife was present for the entirety of the testimony. The court views that testimony by Ms. Jones as indicative both of her self-absorption and her unwillingness to accept that Mr. Dickson has established a new and apparently healthy relationship with another while Ms. Jones has not. The court also concludes Ms. Jones exercised bad judgment when she discussed in the child's presence the details of her past relationship with Mr. Dickson since such matters are beyond a seven year old's level of comprehension and serve only to undermine the child's relationship with her father. She fails to accept responsibility for both her own and Jazmyn's life. Though CT Page 11838 advised by Ms. Kutno she should not remove to Virginia with Jazmyn in view of Judge Brennan's prior custody order, she did just that and, though she remains on probation for another year, she has not advised Virginia's probation department of her presence in that state and her conduct is therefore without present supervision. Jazmyn's frequent unexcused tardies and absences from school in Connecticut posed an impediment to her scholastic development. In fact, when Jazmyn was tardy to school on the first day mastery tests were conducted, it was Mr. Dickson who took it upon himself to pick up the child at her maternal grandmother's each succeeding day of testing to ensure her timely arrival and full participation. As of May, 2000, Jazmyn had twenty-nine (29) unexcused absences. In response to the court's inquiry whether Jazmyn had been arriving to school on time while in Virginia, Ms. Jones responded Jazmyn could be difficult to handle and that it was sometimes "hard" to get her to school on time. The court therefore has concluded the pattern of tardiness continues and that it is the plaintiff father who has the greater understanding of the need to be at school on time and it is he who has a greater appreciation of Jazmyn's need for a sound education. It has not escaped the court's attention that getting Jazmyn to school on time should be easier for Ms. Jones to accomplish since she finishes work at 6:30 a.m. and therefore has sufficient time to prepare the child for school and see to it that the child leave home on time.
Perhaps the most telling evidence relevant to the mother's desire to parent Jazmyn was Ms. Jones' response to the court's inquiry whether, if she could have residential custody of her daughter in this state, she would be willing to return to Connecticut (and thus facilitate her daughter's continuing relationship with her father and maternal grandparent) or whether she would choose instead to stay in Virginia with her adult daughter and seven year old grandson. With no hesitation, Ms. Jones chose the latter option. In view of the likelihood her employer would agree to a transfer back to Connecticut and in view also of Ms. Zutno's testimony such an arrangement would be "tolerable" though not "preferred" (of which testimony the court reminded Ms. Jones prior to soliciting her response), the court can only conclude Jazmyn's physical custody is not the mother's primary concern.
The court therefore finds it to be in Jazmyn's best interest that Mr. Dickson and Ms. Jones share joint legal custody with residential custody to the plaintiff father who will provide a stable, loving home environment which will provide the child the nurturing and discipline necessary to the realization of Jazmyn's physical, social, emotional, and academic development. It will also permit Jazmyn's continued relationship with Ms. Dunbar who has been a stabilizing influence in this young girl's life. The defendant mother shall have visitation on alternate weekends but that visitation shall be supervised until Ms. Jones undergoes hair CT Page 11839 follicle testing and tests negative for drug use. The cost of the testing shall be borne equally by the parties. Assuming her willingness to provide such supervision, the maternal grandmother, who testified she wanted to visit her daughter in Virginia, may supervise those visits here or in Virginia. Should she decline to do so, the parents are to agree who will provide the adult supervision and they may return to court for guidance if they cannot so agree. Ms. Jones may request of her probation officer her assistance in arranging for the hair follicle testing or she may seek the assistance of Family Relations in arranging the same. Only when Ms. Jones can demonstrate the test has been performed and she has tested negative shall she have unsupervised visitation on alternate weekends. Under the same terms, the parents shall agree upon a schedule which permits Ms. Jones reasonable visitation during school vacations, summer vacations, and on Thanksgiving, Christmas, and Easter. If the parties cannot agree on a visitation schedule, they shall return to court for further direction. For the present, Mr. Dickson shall have the right to claim Jazmyn as a dependent for tax purposes.
SO ORDERED.
SHEEDY, J.